# United States Tax Court

T.C. Memo. 2026-64

SCOTT L. REED AND STACY N. REED,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

_____

Docket No. 13757-20.                      Filed August 5, 2026.

_____

*Tyler H. DeWitt* and *Clinton L. DeWitt*, for petitioners.

*Catherine S. Tyson*, *Andrew D. Reiter*, and *Philip Edward Blondin*, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

TORO, *Judge*: In this deficiency case, we must untangle the federal income tax consequences of the complicated financial lives of petitioners, Scott L. Reed and Dr. Stacy N. Reed. During the taxable years 2012 through 2015 (years at issue), the Reeds received income from myriad sources and were involved in projects including real estate development, the starting of a medical practice, and sales of reclaimed wood. Across the Reeds' varied activities, recordkeeping left much to be desired, and the Commissioner of Internal Revenue determined that the Reeds (a) failed to properly report their income and (b) claimed deductions and a credit to which they were not entitled. He also determined that additions to tax and penalties apply. The Reeds contest these determinations.

The parties having settled some issues, we are left to decide the following: (1) whether the Reeds underreported income from various sources; (2) whether the Reeds are entitled to deductions for (a) various

[*2] payments and transfers, (b) amounts they paid to lease farmland, and (c) amounts they claimed to have paid as interest; (3) whether the Reeds are entitled to a general business credit for the taxable year 2012; and (4) whether additions to tax and penalties apply to the Reeds for the years at issue. As we explain in greater detail below, we conclude that the Reeds have carried their burden of proof only with respect to some of the issues that remain.

## FINDINGS OF FACT

The following facts are derived from the pleadings, Stipulations of Fact with attached Exhibits, as supplemented, and the testimony and Exhibits admitted into evidence at trial.

I.    *The Reeds*

A.    *Mr. Reed*

Mr. Reed grew up around construction. His father and grandfather worked in construction, and beginning early in life he joined them on jobsites as they built apartments, homes, and other buildings. He studied at the University of California, Davis, and worked in construction while he was a student.

After Mr. Reed graduated from college, he went to work as a real estate consultant. He started his career at Arthur Andersen and later worked for Standard & Poor's.

Early in his career, Mr. Reed became a consultant for the United States Navy. He assisted the Navy in disposing of closed bases, including Naval Air Station Alameda Point and Naval Station Treasure Island. In time, Mr. Reed began to specialize in real estate development subsidized by tax credits, particularly credits for the development of historic properties.

Mr. Reed eventually started his own firm, Reed Realty Advisors, LLC. Reed Realty Advisors performed real estate consulting and real estate development work for its clients.

Reed Realty Advisors was a single-member limited liability company wholly owned by Mr. Reed and was treated as a disregarded entity for federal tax purposes. Mr. Reed was the company's managing director. He worked alongside Alex Dzyuba, the company's director of construction, and Jake Spellmeyer, the company's director of finance

[*3] and accounting.  Mr. Spellmeyer later left Reed Realty Advisors to start his own firm.

Mr. Reed's work with the Navy continued through Reed Realty Advisors.  Reed Realty Advisors also consulted for the General Services Administration and private-sector clients.

Reed Realty Advisors performed multiple functions for the real estate development projects with which it was associated.  In the early stages of a project, it would assist in site selection and property acquisition by conducting market research for the area near a prospective building and measuring and modeling the building to determine how it could be used in the future.  Reed Realty Advisors often hired Linda Hernandez, Mr. Reed's mother, to measure and prepare models for buildings of interest.  At this stage, Reed Realty Advisors would also engage land use consultants, accounting firms, or other specialists to determine whether development would be viable.

Once construction was underway, Reed Realty Advisors would coordinate contractors and monitor progress on the project.  Reed Realty Advisors often hired Bruce Reed, Mr. Reed's father, to consult on questions about construction.  And it hired an entity separately owned by Mr. Dzyuba to help import materials and fixtures.

As some projects concluded, Reed Realty Advisors advised investors on how to wind up their involvement.  At this stage of development, Reed Realty Advisors sometimes obtained legal advice.

Neither party has introduced into evidence the complete books and records of Reed Realty Advisors.  Additionally, although Reed Realty Advisors had its own bank account, during the years at issue, Mr. Reed also used the Reeds' personal bank accounts for deposits and withdrawals related to Reed Realty Advisors.

B.    *Dr. Reed*

Dr. Reed is a medical doctor.  After starting medical school in New York, she finished her degree at Oregon Health and Science University.  Dr. Reed then pursued her residency at the University of Arkansas for Medical Sciences, and the Reeds moved to Little Rock, Arkansas, during her residency.

After her residency, Dr. Reed returned to Portland, Oregon, to work for Allergy, Asthma & Dermatology Associates.  Mr. Reed joined

[*4] her there by the end of 2012. Later, Dr. Reed started her own practice in Portland, Reed Dermatology Northwest.

The Reeds continued to live in Portland when they filed their Petition.

## II. *Mr. Reed's Real Estate Activities*

During the years at issue, Mr. Reed and Reed Realty Advisors were involved in multiple real estate development projects in Arkansas and Alabama. Three of those projects are relevant to this case: (1) Main Street Lofts, (2) K Lofts, and (3) TJ Tower.

### A. *Main Street Lofts*

Main Street Lofts, LLC (Main Street Lofts), was formed on April 30, 2012. Mr. Reed held an interest in Main Street Lofts through Reed Property Group 3, LLC, a disregarded entity. He was also a manager of Main Street Lofts, which was treated as a partnership for federal income tax purposes during the years at issue.

The Main Street Lofts project was located on Main Street in Little Rock, Arkansas. Its properties included the Boyle Building at 500 Main Street, the MM Cohn Building at 510 Main Street, the Arkansas Annex at 514 Main Street, and the Arkansas Building at 524 Main Street. Main Street Lofts acquired its properties in August 2012 for $1.5 million.

Funding for the project came from various sources, including investors in Main Street Lofts, bank financing, and tax credits from the State of Arkansas.[1]

Main Street Lofts' bank financing came from Riverside Bank. Main Street Lofts and Riverside Bank entered into a construction loan agreement on July 22, 2013. Under that agreement, Main Street Lofts could borrow up to $3,182,000 for the acquisition and improvement of its properties. The Reeds guaranteed the construction loan, as did two other individuals, Wooten Epes and Brian Corbell.

The Main Street Lofts project faced unforeseen challenges during its development. In 2013 or 2014, for example, a fire broke out in one of

---

[1] The State of Arkansas provides a historic rehabilitation income tax credit. Ark. Code Ann. § 26-51-2204 (2025).

[*5] the project's buildings. And in 2015, a truck accidentally pulled a fire hydrant out of the ground in front of one of the buildings, causing the building to flood.

One of the project's greatest obstacles arose in 2015, when it became clear that changes in the Arkansas law governing historic tax credits would decrease the amount Main Street Lofts could claim in future credits. *See* Ark. Code Ann. § 26-51-2204(a)(2) (limiting the Arkansas historic rehabilitation income tax credit beginning March 20, 2015).

After the years at issue, the investors in Main Street Lofts ended their involvement with the project through a transaction with an entity called Deep Creek.[2]

B.    *K Lofts*

The K Lofts project was also located on Main Street in Little Rock. K Lofts, LLC (K Lofts), purchased the building at 315 Main Street in November 2010. Mr. Reed held an interest in K Lofts through K Lofts Member One, LLC, a disregarded entity, and was a manager of K Lofts. K Lofts was treated as a partnership for federal income tax purposes during the years at issue.

As with the Main Street Lofts project, funding for the K Lofts project came from investors, bank financing, and state tax credits. On the banking front, K Lofts borrowed $1,375,000 from IBERIABANK. Mr. Reed and Brian Corbell guaranteed the loan.

The K Lofts project faced challenges throughout its development. For example, the back wall of the property collapsed while a void behind it was being filled with concrete. Insurance covered a significant portion of the costs associated with the wall's collapse. Other setbacks—burst pipes and break-ins, to name two—caused additional unanticipated costs.

After the years at issue, Deep Creek acquired K Lofts. In the transaction, Mr. Reed exchanged his interest in K Lofts for a membership interest in Deep Creek.

---

[2] The record does not reflect the precise structure of this transaction.

**[\*6]**　C.　*TJ Tower*

The TJ Tower project was coordinated through TJTOWER, LLC (TJ Tower). The project was located in Birmingham, Alabama.

Mr. Reed indirectly held an interest in TJ Tower through Reed Property Group 5, LLC, a disregarded entity.[3] TJ Tower issued a Schedule K–1, Partner's Share of Income, Deductions, Credits, etc., to Reed Property Group 5 for 2015. That Schedule K–1 reflected, as relevant here, interest income of $21,065.

D.　*Sales of Mr. Reed's Interests*

At various times in 2013, Mr. Reed sold some of his member units in Main Street Lofts and K Lofts to third parties, as shown in the following table:

| Entity | Date of Sale | Number of Member Units Sold | Amount Realized |
|---|---|---|---|
| Main Street Lofts | January 7, 2013 | 1 | $35,000 |
| Main Street Lofts | January 18, 2013 | 1 | 35,000 |
| K Lofts | January 22, 2013 | 5 | 85,000 |
| K Lofts | January 23, 2013 | 1 | 17,000 |
| K Lofts | February 11, 2013 | 1 | 17,000 |
| K Lofts | April 29, 2013 | 6 | 102,000 |

On their 2013 tax return, the Reeds reported no gain or loss from these sales.

III.　*Payments and Transfers Made by Mr. Reed*

A.　*Payments to Third Parties*

During the years at issue, Mr. Reed used the Reeds' personal accounts to make multiple payments to third parties. The Reeds later treated those payments as trade or business expenses of Reed Realty

---

[3] Reed Property Group 5 also owned TJ Manager, LLC, another disregarded entity that held an interest in TJ Tower.

[*7] Advisors.  *See* Opinion Part IV.A below.  At trial, the parties agreed on the occurrence, timing, and amounts of such payments.[4]

B.    *Transfers to the Projects*

Mr. Reed also transferred funds to Main Street Lofts and K Lofts from the Reeds' personal accounts.  In 2014 and 2015, Mr. Reed transferred approximately $811,000 from the Reeds' own bank accounts to accounts held by Main Street Lofts and K Lofts.

Main Street Lofts generally accounted for transfers from the Reeds' personal accounts by increasing in its books the balance of an account titled "Scott Reed Float Loan."  For 2014, all but one of Mr. Reed's transfers were accounted for in this way.  The transfer not accounted for in this way amounted to $7,000.  In 2015, again, all but one $600 transfer were accounted for in the same fashion.

K Lofts similarly accounted for transfers from the Reeds' personal accounts.  K Lofts' books included accounts titled "Scott Reed Short Term Loan" and "Scott Reed Long Term Loan."  For 2014, K Lofts tracked all but a $200,000 transfer as increases in the short-term loan account.  For 2015, K Lofts again tracked all but one of Mr. Reed's transfers either in the short-term loan account or in the long-term loan account.  The missing transfer totaled $11,000.

The record is unclear as to how K Lofts accounted for the $200,000 transfer in 2014.  The general ledger prepared for K Lofts, which is labeled Mulberry Flats in Exhibit 30-R (perhaps because it was printed in 2018 after Deep Creek took over K Lofts and gave the complex a new name), shows an increase of $200,000 in one of K Lofts' cash accounts on April 14, 2014.[5]  But the entry does not refer to Mr. Reed.[6]  It is instead labeled "Endurance."  Other entries in this account bear the

---

[4] Specifically, the parties agreed to information about the payments (as well as the transfers to the projects we describe below) as set out in certain spreadsheets.  The parties have not stipulated the deductibility or characterization of the payments and transfers.

[5] On the same date, a bank statement for the Reeds shows a transaction labeled "OR TLR transfer to CHK 0306."  For Mr. Reed's other transfers to K Lofts, the Reeds' bank statements show transactions with labels that begin "WIRE TYPE: BOOK OUT" and that contain the name "K LOFTS."

[6] Other entries in K Lofts' cash accounts, matching the dates and amounts of Mr. Reed's transfers, list "Scott Reed" in the "NAME" column of the general ledger.

**[\*8]** same label and virtually all represent increases to the cash account balance.

Under the double-entry accounting system developed during the Renaissance,[7] each entry in a general ledger has two sides—a debit and a credit. *See Norwich Com. Grp., Inc. v. Commissioner*, T.C. Memo. 2025-43, at \*6 n.3. With respect to asset accounts, an account balance is increased by debits and decreased by credits. The same is true with respect to expense accounts.

The April 14, 2014, entry in the cash account is a debit, reflecting the increase in the balance of that account. The corresponding credit for the transaction appears in an expense account titled "Loss From Property Damage."

Thus, it would appear that K Lofts viewed the transaction as reducing the loss it had incurred from the relevant incident. This treatment appears to be consistent with an insured entity's receiving a payment from its insurance company as reimbursement for a covered loss.

C. *Treatment on the Reeds' Returns*

On their returns for the years at issue, the Reeds claimed deductions for the payments and transfers discussed above.

With respect to the payments Mr. Reed made to third parties, the Reeds claimed deductions on Schedules C, Profit or Loss From Business, for Reed Realty Advisors in the following amounts:[8]

---

[7] *Rainbow Tax Serv., Inc. v. Commissioner*, 128 T.C. 42, 47 n.3 (2007) ("Historians generally consider Luca Pacioli (1445–1514 or 1517) to be 'The Father of Accounting' for first documenting in his work Summa de Arithmetica, Geometria, Proportioni et Proportionalita (Venice 1494), the process of double entry bookkeeping.").

[8] The deductions the Reeds claimed for Legal and Professional Services and Repairs and Maintenance for 2012 and for Legal and Professional Services for 2014 exceed by a few thousand dollars each the amounts which the parties have stipulated. The reasons for the differences between the claimed amounts and the stipulated amounts are unclear.

**[*9]**

| Year | Legal & Professional Services | Repairs & Maintenance | Contract Labor | Total |
|------|------|------|------|------|
| 2012 | $48,260 | $83,387 | — | $131,647 |
| 2013 | 88,867 | 108,458 | $149,655 | 346,980 |
| 2014 | 116,130 | 38,745 | 153,601 | 308,476 |
| 2015 | 76,730 | 14,818 | — | 91,548 |

The Reeds treated the transfers from their personal bank accounts to Main Street Lofts and K Lofts as deductible unreimbursed partnership expenses. The Reeds reported these amounts on Schedules E, Supplemental Income and Loss, for the taxable years 2014 and 2015. Supplemental Business Expense Worksheets attached to the Reeds' returns reflect the following amounts claimed for each project:[9]

| Year | Main Street Lofts | K Lofts | Total |
|------|------|------|------|
| 2014 | $115,000 | $371,796 | $486,796 |
| 2015 | 220,525 | 133,250 | 353,775 |

## IV. *The Reeds' Other Activities*

During the years at issue, the Reeds were involved in other activities relevant to the questions before us. Mr. Reed started a second business selling wood reclaimed from truck beds, the Reeds leased farmland in Oregon, and the Reeds owned rental property in Arkansas.

### A. *Selling Reclaimed Wood*

During his time in Arkansas, Mr. Reed learned from a colleague that a nearby business gave away large quantities of used wood. The business specialized in replacing the wooden decks of large trucks. It gave away the worn wood that it had removed from the trucks.

---

[9] The unreimbursed partnership expenses the Reeds claimed with respect to Main Street Lofts for 2015 exceed by approximately $30,000 the amounts stipulated by the parties. As in the case of the Reeds' Schedule C expenses, the reasons for the difference are unclear.

[*10] Mr. Reed collected that wood and then either sold it or used it as flooring in his real estate projects. Mr. Reed sold wood to an entity named Green Star in 2013, 2014, and 2015.

Green Star deposited the following amounts into bank accounts held by the Reeds or Reed Realty Advisors: $10,186 in 2013, $32,981 in 2014, and $5,200 in 2015.

The Reeds' 2013 and 2014 returns included Schedules C that listed the business name "Reed Realty Advisors LLC" and the principal business "Sale of Reclaimed Wood." These Schedules C reflected gross receipts of $4,920 and $26,102 for 2013 and 2014, respectively. The Reeds did not file a Schedule C with respect to the reclaimed wood business for 2015 and did not report any gross receipts from sales of reclaimed wood on their return for 2015.

B.    *Farming*

In the years at issue, the Reeds also developed an interest in living on and operating a farm. So, in 2013, Mr. Reed approached an Oregon landowner about leasing farmland.

At trial, Mr. Reed testified that the landowner was interested in selling the property, rather than leasing it. Nonetheless, the Reeds and the landowner ultimately agreed to a leasing arrangement. The terms of this agreement are unclear: Although the Reeds offered a proposed lease agreement into evidence, that agreement was not signed and, at trial, Mr. Reed testified that he and the landowner had reached an oral agreement that was not reduced to writing.

The Reeds took possession of the property and paid a total of $50,000 to the landowner in quarterly installments. After they had leased the property for one year, the Reeds purchased it.

On the Schedule F, Profit or Loss From Farming, attached to their 2013 tax return, the Reeds claimed a $50,000 rent expense.

C.    *Renting Property*

In 2014, the Reeds owned rental property in Arkansas. A company called Dixon Ventures managed the Reeds' rental property.

For the taxable year 2014, Dixon Ventures issued to the Reeds a Form 1099–MISC, Miscellaneous Income, reporting rental income of

**[\*11]** $38,478. The Reeds reported rents received of just $28,653 on the Schedule E attached to their 2014 return.

V.   *General Business Credit Claimed for 2012*

In addition to the items already described, on their 2012 return, the Reeds claimed a section 38[10] general business credit of $99,800 for rehabilitating the K Lofts property. They claimed the credit on Form 3800, General Business Credit, and specified the full amount as an investment credit. On an attached Form 3468, Investment Credit, the Reeds reported that the full $99,800 represented a rehabilitation credit.

VI.   *Tax Returns and Examination*

The Reeds did not file their federal income tax returns for the years at issue on time. The following table reflects the due dates for each of the four relevant returns and the dates on which the Reeds filed them:

| Taxable Year | Return Due | Return Filed |
|---|---|---|
| 2012 | October 15, 2013 | November 25, 2013 |
| 2013 | April 15, 2014 | January 2, 2015 |
| 2014 | October 15, 2015 | March 30, 2016 |
| 2015 | October 15, 2016 | December 16, 2016 |

The Commissioner examined the Reeds' returns for the years at issue. For the 2012, 2013, and 2014 taxable years, the Commissioner conducted a bank deposit analysis during the examination. He subsequently issued to the Reeds a Notice of Deficiency, determining deficiencies for each of the years at issue as well as additions to tax under section 6651 and penalties under section 6662.

The Reeds timely petitioned this Court for redetermination.

---

[10] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (I.R.C. or Code), in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. All monetary amounts have been rounded to the nearest dollar.

**[\*12]** VII.  *Trial*

We held a four-day trial in Little Rock, Arkansas.  During trial, Mr. Reed testified regarding the various activities at issue in this case.  Other witnesses offered testimony regarding the real estate development projects at the heart of the case.  At the conclusion of trial, we left the record open to allow the parties to file a Supplemental Stipulation of Facts.

OPINION

I.  *Burdens of Proof and Production*

The Commissioner's determinations in a Notice of Deficiency are generally presumed correct, and the taxpayer bears the burden of proving those determinations erroneous.  *See* Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933); *Merkel v. Commissioner*, 192 F.3d 844, 852 (9th Cir. 1999), *aff'g* 109 T.C. 463 (1997).[11]

In cases involving unreported income in the U.S. Court of Appeals for the Ninth Circuit, to which an appeal in this case would ordinarily lie, *see* I.R.C. § 7482(b)(1)(A), the general rule is subject to the following conditions:

> For the presumption to apply . . . the Commissioner must base the deficiency on some substantive evidence that the taxpayer received unreported income.  If the Commissioner introduces some evidence that the taxpayer received unreported income, the burden shifts to the taxpayer to show by a preponderance of the evidence that the deficiency was arbitrary or erroneous.  If the [taxpayer] succeeds in showing that the deficiency was arbitrary or erroneous, the burden shifts back to the Commissioner to show that the [determination] was correct.

*Hardy v. Commissioner*, 181 F.3d 1002, 1004–05 (9th Cir. 1999) (citations omitted), *aff'g* T.C. Memo. 1997-97; *see also Walquist v. Commissioner*, 152 T.C. 61, 67–68 (2019) (collecting authorities);

---

[11] If the taxpayer puts forth credible evidence with respect to any factual issue relevant to ascertaining the taxpayer's liability and meets certain other requirements, the burden of proof shifts to the Commissioner as to that issue.  I.R.C. § 7491(a)(1) and (2).  The Reeds have not argued that section 7491(a) requires the burden to shift for any of the issues before us.  Nor does the record support such a conclusion.

**[\*13]** *Caldwell v. Commissioner*, T.C. Memo. 2022-51, at \*5 ("In cases of unreported income, the Commissioner must establish an evidentiary foundation connecting the taxpayer to the income-producing activity, *Weimerskirch v. Commissioner*, 596 F.2d 358, 361 (9th Cir. 1979), *rev'g* 67 T.C. 672 (1977), or demonstrate that the taxpayer actually received income, *Edwards v. Commissioner*, 680 F.2d 1268, 1270–71 (9th Cir. 1982).").

This case also involves determinations regarding claimed deductions. The taxpayer bears the burden of proving entitlement to any deduction claimed. *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992). Thus, a taxpayer claiming a deduction on a federal income tax return must demonstrate that the Code authorizes the deduction and must maintain records sufficient to enable the Commissioner to determine the correct tax liability. *See* I.R.C. § 6001; *Hradesky v. Commissioner*, 65 T.C. 87, 89–90 (1975), *aff'd per curiam*, 540 F.2d 821 (5th Cir. 1976); Treas. Reg. § 1.6001-1(a).

Under section 7491(c), the Commissioner bears the burden of production with respect to the liability of any individual for any addition to tax or penalty. *Higbee v. Commissioner*, 116 T.C. 438, 446 (2001). Once the Commissioner has met his burden of production, the taxpayer bears the burden of proof and "must come forward with evidence sufficient to persuade [the] Court that the Commissioner's determination is incorrect." *Id.* at 447.

We turn first to the Commissioner's income adjustments.

II.     *Ordinary Income Items*

The Commissioner determined that the Reeds underreported ordinary income from multiple sources during the years at issue. After concessions, four remain at issue: (1) gross receipts from Reed Realty Advisors' real estate business for 2012, 2013, and 2014; (2) gross receipts from Reed Realty Advisors' wood-selling business for 2014 and 2015; (3) taxable interest reported by TJ Tower on Schedule K–1 for 2015; and (4) rents reported by Dixon Ventures on Form 1099–MISC for 2014. The following table summarizes the remaining ordinary income issues:

| [*14] Source | Year | Increase Determined by the Commissioner |
|---|---|---|
| Real Estate Business Gross Receipts | 2012 | $18,888 |
| | 2013 | 14,395 |
| | 2014 | 60,486 |
| Wood-Selling Business Gross Receipts | 2014 | 6,806 |
| | 2015 | 5,200 |
| Rents Reported by Dixon Ventures | 2014 | 9,825 |
| Taxable Interest Reported by TJ Tower[12] | 2015 | 21,146 |

A. *Gross Receipts from Reed Realty Advisors' Real Estate Business*

We begin by examining whether the Commissioner has provided "some substantive evidence" to connect the Reeds with the gross receipts he determined. *See Hardy v. Commissioner*, 181 F.3d at 1004; *Weimerskirch v. Commissioner*, 596 F.2d at 361; *Walquist*, 152 T.C. at 67–68. We conclude that he has.

The Commissioner's determination that the Reeds underreported gross receipts from Reed Realty Advisors' real estate business is supported by the bank deposit analyses conducted during the examinations for 2012, 2013, and 2014. We have long accepted bank deposit analyses to establish the evidentiary foundation required from the Commissioner. *See Clayton v. Commissioner*, 102 T.C. 632, 645–46 (1994); *Alioto v. Commissioner*, T.C. Memo. 2025-125, at *7; *see also Tokarski v. Commissioner*, 87 T.C. 74, 77 (1986) ("A bank deposit is prima facie evidence of income and [the Commissioner] need not prove a likely source of that income."). The bank deposits method assumes that all money deposited into a taxpayer's bank account during a given period constitutes taxable income, but the Commissioner must take into account any nontaxable source or deductible expense of which he has knowledge. *See Clayton*, 102 T.C. at 645–46; *DiLeo v. Commissioner*, 96 T.C. 858, 868 (1991), *aff'd*, 959 F.2d 16 (2d Cir. 1992).

The Reeds argue that the Commissioner's bank deposit analyses do not distinguish between taxable and nontaxable deposits and are therefore insufficient. Even a cursory review of the analyses, however,

---

[12] Initially, a dispute existed concerning unreported taxable interest income for 2012, 2013, and 2014, as well. But the Reeds conceded those amounts at trial.

[*15] shows the claim is baseless. The Commissioner's analyses specifically distinguished between "Non-Taxable Deposits," "Taxable Deposits," and "Transfers" among the accounts reviewed for each of the three years analyzed. We therefore conclude that the bank deposit analyses performed for the Reeds' 2012, 2013, and 2014 taxable years satisfy the Commissioner's burden with respect to the additional gross receipts identified for those years.

We next consider whether the Reeds have met their burden to prove, by a preponderance of the evidence, that the Commissioner's determinations are arbitrary or erroneous. *See Hardy v. Commissioner*, 181 F.3d at 1004–05; *Walquist*, 152 T.C. at 67–68.

The Reeds dispute the treatment of a $40,000 transfer from Connie DeMerell, a friend of Dr. Reed. At trial, Mr. Reed credibly testified that in 2014 he had agreed to help Ms. DeMerell purchase a building in Baton Rouge, Louisiana. According to Mr. Reed, Ms. DeMerell transferred $40,000 to him as an advance for expenses that Mr. Reed would incur while performing due diligence ahead of the purchase. Mr. Reed also testified that, in addition to excluding the $40,000 transfer from income, he did not deduct any expenses covered by the $40,000.

The Commissioner has not rebutted Mr. Reed's testimony and on brief suggests only that, if we conclude the $40,000 is not income to the Reeds, then we must reduce the Reeds' Schedule C expenses by $40,000. We conclude that the $40,000 transfer from Ms. DeMerell was an advance and thus should not be included in the Reeds' income. Further, the record does not reflect that the Reeds attempted to deduct any of the expenses related to the transfer; therefore, we will not take up the Commissioner's suggestion to reduce the Reeds' Schedule C expenses.

With respect to the remaining determinations relating to the gross receipts from Reed Realty Advisors' real estate business, the Reeds argue that "Mr. Reed's testimony, the stipulated facts, and documentary evidence all support the conclusion that no additional taxable gross receipts were received." Pet'r's Op. Br. 52. We disagree. The Reeds have failed to establish that any of the other deposits the Commissioner classified as unreported income were not taxable. Nor have the Reeds established that they reported any of the deposits.

In sum, the record supports treating as additional income to the Reeds the deposits the Commissioner identified as gross receipts from

**[\*16]** Reed Realty Advisors' real estate business, less the $40,000 advance from Ms. DeMerell.

B.    *Gross Receipts from the Wood-Selling Business*

We turn next to the Commissioner's determination that the Reeds had unreported gross receipts from Reed Realty Advisors' wood-selling business for 2014 and 2015.

The Commissioner has established the required minimal evidentiary foundation with respect to these gross receipts. For 2014 and 2015, the parties have stipulated that there were bank deposits totaling at least $32,981 and $5,200, respectively, relating to reclaimed wood sales. And, with respect to 2014, the parties' stipulation is further supported by the Commissioner's bank deposit analysis. The parties' stipulations as to the bank deposits satisfy the Commissioner's burden of production with respect to the gross receipts from reclaimed wood sales. *See Tokarski*, 87 T.C. at 77.

For their part, the Reeds argue that the amounts they reported as gross receipts from selling reclaimed wood during the years at issue are consistent with amounts reported by Green Star on Forms 1099. Neither party introduced into evidence the Forms 1099, and they are not in the record. Regardless, even if Green Star did not report its payments to Reed Realty Advisors on Form 1099, such a failure to report would not cause the payments to be excluded from the Reeds' income. *See* I.R.C. § 61; *see also Reyes Barrios v. Commissioner*, T.C. Memo. 2026-32, at \*4 ("The failure to receive tax information forms . . . does not excuse a taxpayer from his obligation to report income."); *Brunsman v. Commissioner*, T.C. Memo. 2003-291, 2003 WL 22351607, at \*1 (treating a taxpayer's compensation for services as income even though the taxpayer had not received a Form 1099–MISC from his employer). We will therefore sustain the Commissioner's determination that the Reeds underreported gross receipts from Reed Realty Advisors' wood-selling business.[13]

---

[13] With respect to the 2014 taxable year, the Commissioner determined that the Reeds had not reported $6,806 of gross receipts from Reed Realty Advisors' wood-selling business. The parties have stipulated that, for 2014, actual deposits from reclaimed wood sales were $32,981. But the Reeds reported only $26,102 from such sales for that year, leaving a shortfall of $6,879 ($32,981 − $26,102 = $6,879). Because the Commissioner does not seek an increased deficiency with respect to the 2014 taxable year, we sustain only the increase determined in the Notice of Deficiency.

**[\*17]** C.    *Rental Income Reported by Dixon Ventures*

The Commissioner's determination that the Reeds had unreported rental income for 2014 is supported by the Form 1099–MISC issued by Dixon Ventures. That Form 1099 suffices to establish the minimal evidentiary foundation required of the Commissioner. *See Hardy v. Commissioner*, 181 F.3d at 1004–05; *Walquist*, 152 T.C. at 68.

The Reeds did not address the 2014 rental income issue in posttrial briefing. They have therefore abandoned the issue. *See, e.g., Mendes v. Commissioner*, 121 T.C. 308, 312–13 (2003) (reviewed) ("If an argument is not pursued on brief, we may conclude that it has been abandoned."); *Nicklaus v. Commissioner*, 117 T.C. 117, 120 n.4 (2001) (concluding that taxpayers who failed to raise on brief arguments they had made previously had abandoned those arguments); *see also, e.g., Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 738 (9th Cir. 1986) ("[We] will not ordinarily consider matters on appeal that are not specifically and distinctly argued in appellant's opening brief . . . ."). And, because we conclude that the Commissioner has met his burden of production with respect to the rental income, we will sustain the Commissioner's determination that the Reeds had unreported rents in 2014.

D.    *Taxable Interest Reported by TJ Tower*

The Commissioner's determination that the Reeds underreported taxable interest from TJ Tower is supported by the Schedule K–1 for the taxable year 2015 that TJ Tower issued to Mr. Reed's disregarded entity. The 2015 Schedule K–1 reported $21,065 in taxable interest income. The Reeds have not disputed the accuracy of the Schedule K–1, *see* I.R.C. § 6201(d), and it satisfies the Commissioner's burden of production with respect to the amount reported there, *see Hardy v. Commissioner*, 181 F.3d at 1004–05; *Walquist*, 152 T.C. at 68.

The amount reported on the Schedule K–1, however, is $81 less than the amount ($21,146) by which the Commissioner determined the Reeds' 2015 income should be adjusted to account for taxable interest. The Commissioner has not established the minimal evidentiary foundation required with respect to the unsupported $81.

The Reeds argue that, unless they actually or constructively received the interest TJ Tower reported, it cannot constitute their income. In the Reeds' view, because they did not personally receive the interest income, it is not taxable to them. They are mistaken.

**[\*18]** A partner's gross income includes his distributive share of partnership gross income. I.R.C. §§ 61(a)(13), 702; *see also* I.R.C. § 704 (providing rules for determining a partner's distributive share of tax items). "[P]artners are taxable on their distributive or proportionate shares of current partnership income irrespective of whether that income is actually distributed to them." *United States v. Basye*, 410 U.S. 441, 447–48 (1973); *see also Vecchio v. Commissioner*, 103 T.C. 170, 185 (1994).

Here, TJ Tower determined that the Reeds should have included interest income of $21,065 as their distributive share of TJ Tower's interest income.[14] Absent any indication that TJ Tower did not receive interest income in 2015, or that the Reeds' distributive share of such income was not the amount reported, the amount reported by TJ Tower was income to the Reeds without regard to whether they received a distribution of that amount. *See Basye*, 410 U.S. at 447–48; *Vecchio*, 103 T.C. at 185.

III. *Capital Gain or Loss from Sales of Partnership Interests*

We turn next to the Commissioner's determination that the Reeds had unreported net capital gain in 2013 from Mr. Reed's sales of units of Main Street Lofts and K Lofts.

In the Notice of Deficiency, the Commissioner determined that for 2013 the Reeds underreported net capital gain by $92,190, composed of a $108,526 net long-term capital gain and a $16,336 net short-term capital loss. According to the Notice, the net long-term capital gain resulted from Mr. Reed's sales of member units (that is, portions of his partnership interest) of K Lofts, while the net short-term capital loss arose from his sales of member units of Main Street Lofts.[15] The Reeds do not contest that they experienced a loss when Mr. Reed sold units of Main Street Lofts, but they do challenge the gain from Mr. Reed's sales of K Lofts units.

---

[14] That the Reeds owned their interest in TJ Tower through one or more disregarded entities does not affect the analysis. Activities of a disregarded entity "are treated in the same manner as a sole proprietorship, branch, or division of the owner." Treas. Reg. § 301.7701-2(a). Thus, TJ Tower's report of interest income for Reed Property Group 5, LLC, is treated as a report that the Reeds themselves had interest income for 2015.

[15] Recall that, in 2013, Mr. Reed sold 13 units of K Lofts for a total of $221,000 and 2 units of Main Street Lofts for a total of $70,000.

**[\*19]** The Reeds argue that Mr. Reed had substantial basis in his K Lofts units when they were sold, and thus that he realized a loss of approximately $125,000. In his Opening Brief, the Commissioner raises a new argument: that Mr. Reed realized $196,950 of short-term capital gain on the K Lofts unit sales.[16]

Section 741 generally governs the treatment of a sale or exchange of a partnership interest. *See Pollack v. Commissioner*, 69 T.C. 142, 144 (1977) (reviewed). The transferor partner recognizes gain or loss on the sale of his partnership interest. I.R.C. § 741. And that gain or loss is characterized, absent any application of section 751,[17] as gain or loss from the sale or exchange of a capital asset. I.R.C. § 741.

We measure capital gain or loss from the sale of a partnership interest "by the difference between the amount realized and the adjusted basis of the partnership interest, as determined under section 705." Treas. Reg. § 1.741-1(a); *cf.* I.R.C. § 1001(a) (providing a similar rule for sales of property generally).

The amount realized from the sale of a partnership interest includes, among other things, the amount of money paid for the interest. It also includes any reduction in the transferor partner's share of partnership liabilities. Treas. Reg. § 1.752-1(h); *see also* Treas. Reg. § 1.741-1(d) (pointing to rules that address the treatment of liabilities on the sale or exchange of interests in a partnership); Treas. Reg. § 1.1001-2(a)(1) (providing, for sales of property generally, that "the

---

[16] The Commissioner did not raise the increased amount of gain, or the short-term character of the asserted gain, at any time before trial. This Court has "refused to consider new theories raised by [the Commissioner] for the first time in his brief where our consideration of such theories would prejudice the taxpayer." *Sundstrand Corp. & Subs. v. Commissioner*, 96 T.C. 226, 347 (1991). But this rule is not absolute. *See Ware v. Commissioner*, 92 T.C. 1267, 1268 (1989), *aff'd*, 906 F.2d 62 (2d Cir. 1990). Here, the Reeds have not complained that they were prejudiced by the Commissioner's new theory. And because the Reeds argue that they suffered a loss, they presented testimony and evidence at trial relevant to their adjusted basis in the units even without knowing the Commissioner's ultimate position. Thus, we will consider the Commissioner's theory. But, because the increase in the Reeds' gain and the short-term characterization of that gain would increase the Reeds' deficiency, the Commissioner bears the burden of proof with respect to those issues. *See* Rule 142(a); *see also Dynamo Holdings Ltd. P'ship v. Commissioner*, 150 T.C. 224, 237–38 (2018) (reviewed).

[17] Neither party has argued that section 751 applies to Mr. Reed's sales of his K Lofts units. Nor, by its terms, does section 751 appear to be relevant.

[*20] amount realized . . . [i]ncludes the amount of liabilities from which the transferor is discharged as a result of the sale or disposition").

With respect to adjusted basis, section 705 provides that the adjusted basis of a partner's interest is the basis determined under section 722 or section 742, increased or decreased by certain amounts. I.R.C. § 705(a); *Continental Grand Ltd. P'ship v. Commissioner*, No. 859-22, 166 T.C., slip op. at 9 (Mar. 2, 2026). An increase in a partner's share of partnership liabilities is treated as a contribution of money by the partner to the partnership and, therefore, increases the partner's basis. *See* I.R.C. §§ 722, 752(a). And we determine a transferor partner's adjusted basis as of the date of the sale or exchange. Treas. Reg. § 1.705-1(a)(1).

The parties agree on the timing of the sales of Mr. Reed's units (reflected in the table on page 6 above) and the amount paid for each unit ($17,000 per unit). Thus, only the adjusted basis in the units remains to be determined.

The Reeds contend that Mr. Reed's basis in each unit of K Lofts was approximately $25,000. At trial, Mr. Reed referred to "the K–1 from K Lofts," testifying that his capital account was approximately $425,000 and his share of partnership liabilities was approximately $700,000 on the Schedule K–1. He further testified that his cumulative basis, across 45 units, was approximately $1.2 million, yielding approximately $25,000 of basis per unit.[18]

But the record contradicts Mr. Reed's testimony as to his adjusted basis in the K Lofts units. The 2013 Schedule K–1 issued by K Lofts for Mr. Reed's disregarded entity (K Lofts Member One, LLC) reflects capital contributions totaling $533,016, a distribution or withdrawal of $99,696, and a distributive share of partnership liabilities of $298,791 during the year.[19] The Schedule K–1 reflects an ending capital account for Mr. Reed of $425,020 and that Mr. Reed's share of partnership liabilities was $298,791. Assuming that both of those values were reflected in Mr. Reed's basis in K Lofts, Mr. Reed's basis in each unit

---

[18] Total basis of $1.2 million would yield a per-unit basis of $26,667, rather than $25,000 ($1.2 million ÷ 45 units = $26,667). Using the $425,000 and $700,000 amounts that Mr. Reed suggests, however, the per-unit basis would be exactly $25,000. $425,000 + $700,000 = $1,125,000. And $1,125,000 ÷ 45 = $25,000.

[19] For convenience, we will refer to these amounts as attributable to Mr. Reed directly and will not refer to K Lofts Member One, LLC's involvement further.

[*21] would have been only $16,085.[20]  At that basis per unit and a per-unit sale price of $17,000, Mr. Reed would have recognized gain on the sales of his units, rather than a loss.

Moreover, the 2013 Schedule K–1 from K Lofts does not reflect the order in which the relevant contributions, distributions, and incurring of liabilities took place during 2013.[21]  Mr. Reed sold all of the units at issue before or during April 2013.  The record does not reflect when Mr. Reed made his contributions to K Lofts—for example, if they were all made on January 1, 2013, or if they were made sporadically throughout the year.  Nor does the record reflect when Mr. Reed received the $99,696 distribution from K Lofts.  Without more, it is not possible to determine Mr. Reed's basis at the time of each sale, rather than at the end of the calendar year.  *Cf.* Treas. Reg. § 1.705-1(a)(1).

This problem is especially pronounced with respect to Mr. Reed's share of K Lofts' liabilities, because other evidence in the record suggests that K Lofts incurred new liabilities after April 2013.  A "Consent Memorandum of the Members and Managers of K Lofts, LLC," dated May 31, 2013, authorized K Lofts to borrow $1.375 million from IBERIABANK.  If part or all of Mr. Reed's distributive share of K Lofts' liabilities arose after April 2013, it could not have increased Mr. Reed's basis at the time that he sold his K Lofts units.

Even if Mr. Reed's adjusted basis was increased by his share of K Lofts' liabilities before he sold his units, it is unclear whether the $17,000 "gross sale" of each unit, which the parties have stipulated, includes any reduction in Mr. Reed's distributive share of liabilities on account of the sale, as required by section 752.  That is, the assertion that Mr. Reed's basis included his distributive share of liabilities calls into question the correct amount realized on his sales of K Lofts units.

The uncertainty in the record as to when and how Mr. Reed's basis in his K Lofts units increased or decreased leaves us unable to determine that Mr. Reed's adjusted basis as of the dates of his sales is greater than the amount the Commissioner allowed in the Notice of

---

[20] $425,020 + $298,791 = $723,811.  $723,811 ÷ 45 = $16,085.

[21] This is not the only problem with relying on the 2013 Schedule K–1.  Because the 2013 Schedule K–1 was created after the end of the taxable year 2013, it reports that Mr. Reed owned only 31% of K Lofts.  Mr. Reed's distributive shares of partnership income or loss and liabilities reported on the Schedule K–1 would have been based, at least in part, on calculations involving his reduced ownership share.  At the times of the sales, however, Mr. Reed owned as much as 45% of K Lofts.

[*22] Deficiency.  In other words, the Reeds have not met their burden to establish error on this issue.[22]  *See* Treas. Reg. § 1.705-1(a)(1).

In support of the increased capital gain amount presented in his Opening Brief, the Commissioner claims that Mr. Reed had a cumulative adjusted basis of $24,050 at the time of his sales.  The Commissioner arrived at that number by adding up the cash deposit entries in the equity account for Mr. Reed in K Lofts' books and records during January 2013.

The Commissioner's method for determining Mr. Reed's basis ignores the possibility that Mr. Reed had some adjusted basis before making additional contributions during 2013.  Without providing any evidence as to Mr. Reed's basis at the beginning of 2013, the Commissioner has not met his burden with respect to the proposed increased deficiency amount.

Nor has the Commissioner met his burden with respect to the character of Mr. Reed's gain.  The Commissioner claims that K Lofts was formed on January 1, 2013, and that Mr. Reed could not have held his units in K Lofts for more than one year as a result.  This analysis appears to be mistaken.  Although the record does not reflect the precise date on which K Lofts was formed, it appears that K Lofts existed—and acquired property—as early as 2010.  Without establishing when Mr. Reed acquired his units in K Lofts, the Commissioner has not met his burden to establish that Mr. Reed's gain should be characterized as short-term capital gain.

In view of the foregoing, we sustain the Commissioner's determination as to the $108,526 net long-term capital gain reflected in the Notice of Deficiency, but do not agree with the increased gain or the short-term character reflected in the Commissioner's Opening Brief.

Having concluded our analysis of the income adjustments, we turn next to the Commissioner's determinations concerning deductions.

---

[22] This Court has at times applied the *Cohan* rule to estimate a taxpayer's adjusted basis when feasible.  *See Cohan v. Commissioner*, 39 F.2d 540, 543–44 (2d Cir. 1930).  Here, the evidence is insufficient to establish that Mr. Reed's basis at the relevant times was greater than what the Commissioner allowed, and a *Cohan* estimate is therefore not appropriate.  *Cf. Coloman v. Commissioner*, 540 F.2d 427, 431–32 (9th Cir. 1976) ("In the instant case, to allow the *Cohan* doctrine to be invoked by the taxpayers would be in essence to condone the use of that doctrine as a substitute for the burden of proof."), *aff'g* T.C. Memo. 1974-78.

[*23] IV.     *Items of Deduction*

     A.     *Third-Party Expenses Claimed with Respect to Reed Realty Advisors*

On the Schedules C attached to their returns for the years at issue, the Reeds claimed substantial deductions for payments to third parties. The Reeds contend these payments relate to Reed Realty Advisors. During trial, the parties stipulated the timing and amounts of the payments claimed as expenses, so all that remains for decision is whether they are deductible.

On brief, the Reeds argue that they have adequately substantiated these expenses and that the Commissioner has not provided specific evidence to contradict their claims.[23] The Commissioner contends that the Reeds' claimed expenses were truly expenses of the project entities and that the Reeds may not deduct them. Additionally, the Commissioner asserts that the Reeds were entitled to reimbursement for the expenses that Reed Realty Advisors paid, defeating the Reeds' deduction claims.

Section 162(a) allows a taxpayer to deduct all ordinary and necessary expenses paid or incurred in carrying on a trade or business. *See INDOPCO, Inc. v. Commissioner*, 503 U.S. at 85 (describing the requirements of section 162(a)). A trade or business expense is ordinary if it is normal or customary within a particular trade, business, or industry. *Deputy v. du Pont*, 308 U.S. 488, 495 (1940); *Welch v. Helvering*, 290 U.S. at 113–14. A trade or business expense is necessary if it is appropriate and helpful for the development of the taxpayer's

---

[23] With respect to this issue and others, the Reeds' briefs appear to reflect a misunderstanding of the burden of proof principles discussed in Opinion Part I above. The Reeds bear the burden of proof with respect to their claimed deductions. *See INDOPCO, Inc. v. Commissioner*, 503 U.S. at 84.

This is not the only difficulty we have encountered with the Reeds' briefs. Their Simultaneous Opening Brief repeatedly cites pages in the record and transcript that do not support the propositions for which they are cited as well as exhibits that were not introduced into evidence. Some issues are not addressed at all, even though the Reeds and the Commissioner do not appear to have agreed on their resolution. As the Supreme Court reminds us, "judges are not like pigs, hunting for truffles buried in the record." *Murthy v. Missouri*, 144 S. Ct. 1972, 1991 n.7 (2024) (quoting *Gross v. Town of Cicero*, 619 F.3d 697, 702 (7th Cir. 2010)) (cleaned up). When the Reeds' briefs fail to identify support for their assertions, and when they fail to address issues that remain in dispute, it is not the Court's obligation to "scour the record in an attempt to formulate a cogent argument" on the Reeds' behalf. *Jeffers v. Commissioner*, 992 F.3d 649, 653 (7th Cir. 2021).

**[\*24]** business.  *Commissioner v. Heininger*, 320 U.S. 467, 471 (1943); *Welch v. Helvering*, 290 U.S. at 113.  To be deductible, ordinary and necessary expenses must be "directly connected with or pertaining to the taxpayer's trade or business."  Treas. Reg. § 1.162-1(a); *see also Cooper v. Commissioner*, 143 T.C. 194, 213 (2014), *aff'd*, 877 F.3d 1086 (9th Cir. 2017).

Our analysis of the Reeds' claimed deductions turns in large part on the nature of the underlying expenses.  Based on the Exhibits admitted into evidence and the testimony at trial, we have broken the stipulated payments into three categories, set out in Appendixes A, B, and C.[24]

1. *Payments to Advisors and Consultants (Appendix A)*

The record here, including the testimony at trial, persuades us that the Reeds are entitled to deduct the expenses set out in Appendix A, *see infra* pp. 41–45, as trade or business expenses of Reed Realty Advisors.  These expenses include payments to advisors and consultants hired by Reed Realty Advisors, including land use consultants, law firms, and the businesses of David Robinson and Alex Dzyuba.[25]  At trial, Mr. Reed credibly testified as to the nature of these expenses and their relationship to Reed Realty Advisors' activities.  We are persuaded that these expenses are ordinary and necessary to Reed Realty Advisors' real estate business.

With respect to these expenses, the record does not support the Commissioner's argument that Reed Realty Advisors was entitled to reimbursement from the project entities.  For example, the Commissioner has not shown that the books and records of the project entities that have been provided reflect these payments by Reed Realty Advisors as loans by Mr. Reed or as expenses reimbursable to him.

We therefore conclude that the expenses in Appendix A are deductible under section 162(a).

---

[24] The total amounts set out in the Appendixes are based on the testimony and record in this case, but differ from the total amounts the parties claim to be in dispute. Expenses claimed by the Reeds, but not described in the Appendixes, have not been substantiated by the Reeds and are not deductible under section 162(a) or otherwise.

[25] Appendix A also includes a few payments to credit monitoring agencies, a professional certification group, and the Oregon secretary of state.  These expenses also are ordinary and necessary to Reed Realty Advisors.

[*25]    2.    *Payments with Respect to Reed Dermatology
Northwest and Unexplained Payments (Appendix B)*

We are not persuaded, however, that the expenses set out in Appendix B, *see infra* pp. 46–47, are ordinary and necessary expenses of Reed Realty Advisors' business. Appendix B includes expenses paid with respect to Reed Dermatology Northwest—Dr. Reed's medical practice—and other miscellaneous expenses.

As to the Reeds' payments with respect to Reed Dermatology Northwest, the Reeds have not established that such payments were connected with Reed Realty Advisors' business. At trial, Mr. Reed testified that the expenses were

> start-up labor costs for my wife's dermatology practice that she would be opening up. So this is all of the expenses related. The biggest expense is related to the consultant that set up all of our contracts with the health insurers, got us admitted into the Quality Medical Group, got our hospital privileges, and did all of sort of the frontend setup for what would become Reed Dermatology Northwest.

Tr. 519. The Reeds have not argued, nor have they demonstrated, that Reed Realty Advisors was in the trade or business of operating a medical practice. Instead, the Reeds assert that Reed Realty Advisors was in the business of real estate consulting and development, a business to which these payments have no clear tie.

To the extent the Reeds intended to argue that their payments arose in connection with a trade or business separate from Reed Realty Advisors, they have not met their burden of proof to show that they are deductible for the year claimed. Although Dr. Reed did eventually open her own medical practice, the Reeds have not established when that practice began to operate or that it operated through an entity for which the Reeds could claim deductions on their own returns. *See generally Root v. Commissioner*, T.C. Memo. 2025-51, at *9–11 (discussing the legal standards applicable to determining whether a taxpayer is engaged in a trade or business, including the requirement that the taxpayer's business activities actually have commenced).

Appendix B also includes payments the purposes of which are unclear. Some of these payments were not addressed at all during trial and are not explained by the record more broadly. As a result, we are unable to conclude that these payments represent ordinary and

[*26] necessary expenses of Reed Realty Advisors. For other payments in this group, Mr. Reed testified that he had a detailed set of spreadsheets that would provide substantiation. After trial, we left the record open so that the parties could submit those spreadsheets, but the documents submitted by the parties after trial do not shed light on the purposes of the payments. We therefore conclude that the Reeds have not met their burden of proof with respect to these payments.

3. *Payments for Repairs, Construction, and Landscaping at the Projects (Appendix C)*

The analysis is more complicated with respect to the expenses set out in Appendix C. *See infra* pp. 48–50. These expenses reflect payments to contractors for repairs, other construction work, and landscaping performed at the Main Street Lofts, K Lofts, and other real estate projects in which Reed Realty Advisors was involved.

One might view such expenses as belonging either to Reed Realty Advisors or to the relevant project entities depending on the agreements between those businesses and the general structure of their working relationship. Here, the Reeds have not demonstrated that the expenses belonged to Reed Realty Advisors. We have received no evidence that Reed Realty Advisors was committed to incurring these types of costs in connection with the Main Street Lofts, K Lofts, or other projects.

That these expenses belonged to the project entities is confirmed by the parties' stipulation that, for each historic real estate development project in which Reed Realty Advisors was involved, "[t]he costs of the acquisition, contractors, and construction were to be borne by the respective LLC." First Stip. of Facts, para. 19.

A taxpayer generally may not deduct the payment of another person's expenses. *See du Pont*, 308 U.S. at 494–95; *Welch v. Helvering*, 290 U.S. at 114; *Betson v. Commissioner*, 802 F.2d 365, 368 (9th Cir. 1986), *aff'g in part, rev'g in part* T.C. Memo. 1984-264; *Dietrick v. Commissioner*, 881 F.2d 336, 338 (6th Cir. 1989), *aff'g* T.C. Memo. 1988-180; *Lohrke v. Commissioner*, 48 T.C. 679, 684 (1967); *Eskimo Pie Corp. v. Commissioner*, 4 T.C. 669, 677 (1945), *aff'd per curiam*, 153 F.2d 301 (3d Cir. 1946). Under this general rule, absent an exception, Reed Realty Advisors would not be entitled to deduct the expenses it paid on behalf of the project entities.

The Reeds suggest that they are entitled to an exception under a line of authorities stemming from *Lohrke*. This line of authorities comes

**[\*27]** with conditions: We have recognized a narrow exception to the general rule where (1) the taxpayer's primary motive for paying the other's obligation is to protect or promote the taxpayer's own business and (2) the expenditure is an ordinary and necessary expense of the taxpayer's business. *Lohrke*, 48 T.C. at 688; *see also Cooper*, 143 T.C. at 214; *Plano Holding LLC v. Commissioner*, T.C. Memo. 2019-140, at \*8–9.[26]

The Reeds' argument falls short at the first *Lohrke* prong. Generally, the first prong requires that a taxpayer pay "the other person's expense primarily to benefit its business, with the receipt by the other person of any benefit from the payment being merely incidental." *HIE Holdings, Inc. v. Commissioner*, T.C. Memo. 2009-130, 2009 WL 1586044, at \*95, *aff'd*, 521 F. App'x 602 (9th Cir. 2013). To establish that it acted primarily to benefit its own business, the taxpayer must "demonstrate a direct nexus between the purpose of the payment and the taxpayer's business or income-producing activities." *Bone v. Commissioner*, T.C. Memo. 2001-43, 2001 WL 180170, at \*4 (citing *Lettie Pate Whitehead Found., Inc. v. United States*, 606 F.2d 534, 538 (5th Cir. 1979)), *aff'd*, 324 F.3d 1289 (11th Cir. 2003).

"The potential harm for which a business is protected through the payment of the other person's expense must be direct and proximate." *HIE Holdings, Inc. v. Commissioner*, 2009 WL 1586044, at \*96; *see also Square D Co. & Subs. v. Commissioner*, 121 T.C. 168, 200 (2003); *Hood v. Commissioner*, 115 T.C. 172, 181 (2000). Typically, when the exception applies, the taxpayer has paid expenses on behalf of another who was unable to make payment. *See Square D Co.*, 121 T.C. at 200 (collecting authorities); *Hood*, 115 T.C. at 180–81 (same).

---

[26] As then-Judge Kennedy observed in a similar context:

If [a taxpayer] paid corporate expenses in the ordinary and necessary course of some trade or business *of his own*, a deduction would be permitted. *See, e.g.*, *Madden v. Commissioner*, 40 T.C.M. (CCH) 1103, 1111 (1980); *Lohrke*, 48 T.C. at 688–89; *cf. O'Neill v. Commissioner*, 271 F.2d 44, 48 (9th Cir. 1959) (considering loss deduction). Payments made, however, with the purpose of keeping in business a corporation in which the taxpayer holds an interest are not deductible. *Madden*, 40 T.C.M. at 1111. *Cf. Dodd v. Commissioner*, 298 F.2d 570, 576–77 (4th Cir. 1962) (deduction disallowed where expenses of corporation are only "incidentally related" to taxpayer's own trade or business).

*Betson v. Commissioner*, 802 F.2d at 368 (cleaned up).

**[\*28]** We are not persuaded that Reed Realty Advisors paid the project entities' repair and construction expenses primarily for its own benefit. On brief, the Reeds have shed little light on the purpose of Reed Realty Advisors' payments. At trial, Mr. Reed testified that his primary goal at Reed Realty Advisors was to obtain a development fee, an amount paid to Reed Realty Advisors at the end of a given project. Tr. 384 ("[T]he main reason why I do these developments is for the development fee."). But several points cut against the conclusion that there was a direct nexus between the purpose of Reed Realty Advisors' payments and earning a development fee.

First, the Reeds have not demonstrated that the real estate projects were unable to pay their own expenses in 2012 or 2013, or that the projects would have faced difficulty in doing so. Thus, it is unclear how Reed Realty Advisors' payment of the projects' expenses in those years helped to safeguard its eventual fee.

Mr. Reed occasionally referred to the expenses paid by Reed Realty Advisors as falling outside a budget approved by the relevant project's partners and the bank that financed the project. But the Reeds have not provided copies of those budgets or any other documentary evidence to support their claim. Moreover, it is not apparent why unbudgeted expenses would have been the responsibility of Reed Realty Advisors or would have threatened its compensation or the ultimate success of the projects.

Second, the terms of Reed Realty Advisors' compensation for the projects are unclear. The record does not contain agreements between Reed Realty Advisors and the project entities, nor does it speak to when, how, or subject to what conditions Reed Realty Advisors would be paid its fee. Without specificity as to Reed Realty Advisors' stake in the success of its projects, it is difficult to conclude that there was a "direct nexus" between Reed Realty Advisors' payments and its own income-producing activities. *See, e.g.*, *Bone v. Commissioner*, 2001 WL 180170, at \*4.

Third, Mr. Reed was an investor in the projects for which Reed Realty Advisors paid expenses. If the projects had succeeded, he would have received a personal benefit. Mr. Reed's personal stake in the projects casts doubt on the possibility that benefits accruing to the project entities from Reed Realty Advisors' payments were "merely incidental" to the payments' true purpose. *See, e.g.*, *HIE Holdings, Inc. v. Commissioner*, 2009 WL 1586044, at \*95.

**[\*29]** All told, the record here does not support the conclusion that Reed Realty Advisors paid the project entities' expenses primarily for its own benefit. We therefore find that the Reeds have failed to satisfy the first prong of the *Lohrke* analysis and are not entitled to deduct the expenses set out in Appendix C.[27]

B. *Transfers Made to Main Street Lofts and K Lofts*

On the Schedules E attached to their 2014 and 2015 returns, the Reeds claimed substantial deductions for amounts that they labeled unreimbursed partnership expenses. During trial, the parties stipulated the timing and amounts of transfers the Reeds made to Main Street Lofts and K Lofts during those years.

The Reeds now argue that the transfers are deductible (1) as section 162 trade or business expenses of Reed Realty Advisors, similar to the Schedule C expenses discussed above; (2) as unreimbursed partnership expenses paid by the Reeds (consistent with their return position); or (3) as partially or wholly worthless debts under section 166. The Commissioner disagrees with each of these arguments.

We start by recalling that, as the Supreme Court has observed, "while a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not." *Commissioner v. Nat'l Alfalfa Dehydrating & Milling Co.*, 417 U.S. 134, 149 (1974); *see also Lomas Santa Fe, Inc. v. Commissioner*, 693 F.2d 71, 73 (9th Cir. 1982) ("[I]t is ultimately up to the taxpayer and not the courts to structure transactions in a manner eligible for favorable tax treatment . . . ."), *aff'g* 74 T.C. 662 (1980). In other words, taxpayers are generally bound by the form of the transaction that they choose. *See Temnorod v. Commissioner*, T.C. Memo. 2025-127, at \*19 (citing *Commissioner v. Nat'l Alfalfa Dehydrating & Milling Co.*, 417 U.S. at 149).

---

[27] Similar reasons support the conclusion that the expenditures were not ordinary and necessary expenses of Reed Realty Advisors' business and thus that they do not satisfy the second *Lohrke* prong.

**[\*30]** Here, the Reeds transferred funds directly to Main Street Lofts and K Lofts. In form, the transfers appear to be either contributions to capital or loans made by the Reeds to the project entities.[28]

The Reeds' theories resist the form of the transfers. They would require us to conclude that, by transferring funds to Main Street Lofts and K Lofts, the Reeds actually paid the projects' creditors. We are unable to reach such a conclusion on the evidence before us, and thus we must sustain the Commissioner's determination that the Reeds are not entitled to deductions for their transfers.[29]

But this is not the only problem facing the Reeds' arguments. Even assuming that the Reeds actually paid the projects' creditors by making their transfers, the Reeds' arguments fail as we explain below.

### 1. *Trade or Business Expense Deduction*

First, the Reeds argue that their transfers were truly payments, by Reed Realty Advisors, of expenses belonging to Main Street Lofts and K Lofts. Therefore, they contend, Reed Realty Advisors is entitled to a deduction under section 162(a) with respect to those transfers. For this argument to succeed, the transfers must have been "paid or incurred" by Reed Realty Advisors and must not have been reimbursable. *See supra* Opinion Part IV.A (explaining the requirements of section 162(a)).

"[D]eductions for expenses can be taken only by the party who actually 'paid or incurred' them." *United States v. Cocke*, 399 F.2d 433, 447 (5th Cir. 1968) (quoting § 162) (citing *Helvering v. Price*, 309 U.S. 409, 413 (1940)); *Brown v. Commissioner*, T.C. Memo. 2017-18, at \*17–18. Here, the Reeds made their transfers from their personal checking accounts, rather than Reed Realty Advisors' accounts. And Main Street

---

[28] If the Reeds intend to argue that Main Street Lofts and K Lofts were insolvent when the transfers were made, the transfers would nevertheless not be deductible. *See Scheurer v. Commissioner*, T.C. Memo. 2017-36, at \*11 (stating that "[a]dvances made to an insolvent debtor generally do not create debts for tax purposes but are characterized as capital contributions or gifts" and collecting authorities).

[29] The Reeds have argued that their most substantial transfer, $200,000 sent to K Lofts, was used to pay expenses arising from the collapse of a wall on the K Lofts property. As we have explained, the record is not clear as to what occurred with respect to this transfer. But, even if it were true that K Lofts used that amount to pay for repairs or other expenses after the collapse, the fact that the Reeds transferred the amount to K Lofts defeats their claim that they are entitled to deduct that amount as an expense paid on behalf of K Lofts. Simply put, under the Reeds' view of the facts, the Reeds did not pay an expense for K Lofts—they paid K Lofts itself.

**[\*31]** Lofts and K Lofts recorded nearly all of the transfers as loans from Mr. Reed. These facts suggest that the Reeds themselves made the transfers at issue here. That means that Reed Realty Advisors did not "pay or incur" any amounts for which it would be entitled to a deduction.

This conclusion is bolstered by the obligations the Reeds had, in their personal capacities, as guarantors of the project entities' loans. At trial, Mr. Reed testified that he made the transfers so that Main Street Lofts and K Lofts could meet their loan obligations. Robert Dudley, an executive from Riverside Bank, testified that he asked Mr. Reed to support the project entities because he knew that Dr. Reed's income would allow the Reeds to make cash transfers. This testimony, together with the record as a whole, further confirms that the Reeds made the transfers in their personal capacities and that the transfers were not "paid or incurred" by Reed Realty Advisors.

Even if Mr. Reed had made the transfers at issue in his role as the owner of Reed Realty Advisors, it appears that the transfers were treated by the projects as loans or advances that would be repaid. Generally, a taxpayer cannot deduct an expenditure for which he can be reimbursed. *See Orvis v. Commissioner*, 788 F.2d 1406, 1408 (9th Cir. 1986) (applying this rule in the context of reimbursable employee expenses and collecting authorities), *aff'g* T.C. Memo. 1984-533; *Canelo v. Commissioner*, 53 T.C. 217, 223–24 (1969), *aff'd per curiam*, 447 F.2d 484 (9th Cir. 1971); *see also, e.g.*, *Burnett v. Commissioner*, 356 F.2d 755, 759–60 (5th Cir. 1966) ("[I]t is well settled that an expenditure for which there is an unconditional right of reimbursement is not deductible as a business expense . . . ."), *remanding on other issues* 42 T.C. 9 (1964); *Levy v. Commissioner*, 212 F.2d 552, 554–55 (5th Cir. 1954) ("It is well settled that expenses for which there exists a right of reimbursement are not ordinary and necessary business expenses . . . ."), *aff'g* 12 T.C.M. (CCH) 235 (1953); *Glendinning, McLeish & Co. v. Commissioner*, 61 F.2d 950, 952 (2d Cir. 1932) (noting that amounts for which reimbursement could be sought "could not be expenses of any kind" and were not deductible as ordinary and necessary expenses), *aff'g* 24 B.T.A. 518 (1931). "The reason for not allowing a deduction under the above principle is that the expenditures, being in the nature of advances or loans to a third party, are not expenses of the taxpayer's business." *Flower v. Commissioner*, 61 T.C. 140, 152 (1973), *aff'd*, 505 F.2d 1302 (5th Cir. 1974) (unpublished table decision).

Main Street Lofts and K Lofts recorded most of Mr. Reed's transfers as loans. And exhibits in the record support the conclusion

**[*32]** that the project entities repaid some of these amounts to Mr. Reed during 2014, decreasing the loan account balances as they did so. The Reeds have offered no persuasive explanation for why the project entities treated most of Mr. Reed's transfers as loans if they were not reimbursable. As a result, we conclude that the Reeds cannot deduct their transfers as trade or business expenses of Reed Realty Advisors under section 162(a).

### 2. *Unreimbursed Partnership Expenses*

Second, the Reeds argue that their transfers were unreimbursed partnership expenses. "It is well established that a partner cannot himself deduct the expenses of a partnership, even if he incurred the expenses in furtherance of partnership business." *Probandt v. Commissioner*, T.C. Memo. 2016-135, at *22–23 (collecting authorities). "An exception applies when there is an agreement among the partners in a partnership agreement, or in a routine partnership practice tantamount to an agreement, that calls for a partner to pay partnership expenses out of his own funds." *Id.* at *23; *see Klein v. Commissioner*, 25 T.C. 1045, 1051–52 (1956). The requirements of this exception doom the Reeds' theory.

The Reeds have not established that Mr. Reed was required to pay expenses of the project entities by a partnership agreement or tantamount practice. Neither the operating agreement for Main Street Lofts nor that for K Lofts contains such a requirement, and the Reeds have not provided other persuasive evidence that such an agreement or practice existed.

The Reeds contend that Mr. Reed's guaranty agreements satisfy *Klein*'s agreement requirement. This is incorrect. In *Klein*, 25 T.C. at 1051–52, we stated that an exception applies when a partner is required "under a partnership agreement" to pay certain expenses. Although Mr. Reed's guaranties are agreements, they are not partnership agreements.

Moreover, for the *Klein* exception to apply, a partner must be required to pay an expense "out of his own funds." *Id.* A partner entitled to reimbursement is not required to pay an expense out of his own funds. *See, e.g.*, *McLauchlan v. Commissioner*, 558 F. App'x 374, 379 (5th Cir. 2014) ("The requirement that an expense not be reimbursable by the partnership in order to be deductible flows from the fact that partnership expenses may only be deducted on an individual partner's

**[\*33]** tax return if the partnership agreement provides 'such expenses shall be borne by particular partners *out of their own funds*.' *Wallendal* [*v. Commissioner*], 31 T.C. [1249,] 1252 [(1959)] (emphasis added)."), *aff'g in relevant part* T.C. Memo. 2011-289; *Frazier v. Commissioner*, T.C. Memo. 2024-3, at \*128. As discussed above, the Reeds have not established that they were not entitled to reimbursement for their transfers.[30] Thus, the Reeds cannot deduct their transfers as unreimbursed partnership expenses.

### 3. *Partially or Wholly Worthless Debts*

Third, the Reeds argue that their transfers were guaranty payments for which they are entitled to a worthless debt deduction under section 166. Treasury Regulation § 1.166-9 provides that a guarantor's payment can give rise to a worthless debt deduction when the underlying debt between the debtor and the guarantor becomes worthless.[31] When a guarantor pays a debt, "the debtor's obligation to the creditor becomes an obligation to the guarantor" because the guarantor "steps into the creditor's shoes." *Putnam v. Commissioner*, 352 U.S. at 85. When the debtor's obligation to the guarantor becomes worthless, the guarantor is entitled to a deduction under section 166. *Id.* ("[T]he loss sustained by the guarantor unable to recover from the debtor is by its very nature a loss from the worthlessness of a debt."); Treas. Reg. § 1.166-9(a), (e)(2).

"Debts are wholly worthless when there are reasonable grounds for abandoning any hope of repayment in the future, *Dallmeyer v. Commissioner*, 14 T.C. 1282, 1292 (1950), and it could thus be concluded that they have lost their 'last vestige of value.' *Bodzy v. Commissioner*, 321 F.2d 331, 335 (5th Cir. 1963)[, *rev'g and remanding* T.C. Memo. 1962-40]." *Estate of Mann v. United States*, 731 F.2d 267, 276 (5th Cir. 1984). "When or whether a debt becomes worthless is a question of fact,

---

[30] The Reeds' argument that their transfers were compelled by Mr. Reed's guaranty agreements cuts against the conclusion that the transfers were not reimbursable. "The familiar rule is that, *instanter* upon the payment by the guarantor of the debt, the debtor's obligation to the creditor becomes an obligation to the guarantor . . . ." *Putnam v. Commissioner*, 352 U.S. 82, 85 & n.8 (1956) (collecting authorities). If Mr. Reed made payments pursuant to his guaranty of the project entities' obligations, the entities owed the amounts of those payments back to Mr. Reed. This, coupled with the Reeds' failure to prove that the entities could not repay the obligations, is enough to conclude that the Reeds have not established that the transfers could not be reimbursed.

[31] We assume solely for purposes of our analysis that the prerequisites for the application of Treasury Regulation § 1.166-9 are met.

**[*34]** the answer to which lies in an examination of all the circumstances." *Am. Offshore, Inc. v. Commissioner*, 97 T.C. 579, 594 (1991) (citing *Boehm v. Commissioner*, 326 U.S. 287, 293 (1945)). A bad debt is deductible only for the year it becomes worthless. *Id.* (collecting authorities).

The Reeds have not established that the obligations arising from their transfers became partially or wholly worthless during the years at issue. As discussed above, Main Street Lofts and K Lofts tracked the amounts owed to Mr. Reed as loans. Although Main Street Lofts and K Lofts may have been without cash at the time of Mr. Reed's transfers, repayment may have been possible if the projects had later rented or sold their properties.[32]

Additionally, as discussed at trial, other guarantors were jointly and severally liable for the project entities' construction loans. The Reeds have not demonstrated that they could not have recovered at least a portion of the transferred funds from their co-guarantors. At trial, Mr. Reed observed that one of the other guarantors for Main Street Lofts' loan—Wooten Epes—held real estate interests but was not liquid:

> I wanted him to pay for some of them. I didn't want to have to even pay for them, but it's not always easy to liquidate a percentage ownership in, like, an apartment building. It's hard to monetize and trade, especially if the people that own the rest of the ownership percentage are not interested in buying your share out.

Tr. 722. But the fact that Mr. Epes's wealth was in real estate interests does not mean that it would have been impossible to collect from him. Mr. Epes could have satisfied the obligation to Mr. Reed by, for example, transferring a real estate interest. Because Mr. Reed could have sought contribution from other guarantors of the project entities' loans, the Reeds have not established that any obligations of the project entities to him became worthless during the years at issue.

---

[32] After the years at issue, Deep Creek acquired K Lofts, and, in the transaction, Mr. Reed exchanged his member units in K Lofts for member units in Deep Creek. These actions suggest that he had not yet "abandon[ed] any hope of repayment in the future," *Estate of Mann*, 731 F.2d at 276 (citing *Dallmeyer*, 14 T.C. at 1292), and that K Lofts had not yet "lost [its] 'last vestige of value,'" *id.* (quoting *Bodzy v. Commissioner*, 321 F.2d at 335).

**[\*35]** And, to the extent the Reeds argue that any obligations of the project entities to Mr. Reed became partially worthless during the years at issue, the Reeds have provided no evidence that they charged off any part of the obligations during those years as required by Treasury Regulation § 1.166-3(a)(2). Accordingly, we conclude that the Reeds cannot deduct their transfers as partially or wholly worthless debts during the years at issue.

*       *       *

Having addressed the Reeds' arguments, we find ourselves back where we started. The Reeds appear to have made capital contributions or loans to the project entities. If the Reeds' transfers were capital contributions, they are not entitled to deductions for them. If they were loans—as Main Street Lofts' and K Lofts' accounting treatment would suggest—then the Reeds have not established that they were worthless in the years at issue.[33] The Reeds therefore are not entitled to deductions for the transfers they made.

C.    *Amounts Paid for the Reeds' Farm Lease*

On their 2013 return, the Reeds claimed a $50,000 deduction for rent in connection with a farming activity. The Commissioner disallowed that deduction. The Reeds argue that the $50,000 was rent paid for the farm they used during 2013. Their argument is supported by Mr. Reed's testimony as to the oral agreement between him and the landowner.

The Commissioner argues that the $50,000 amount exceeds the ordinary rental value of the property and suggests that a portion of the amount was paid for the option to purchase the farmland, rather than as rent.

Section 162(a)(3) permits a deduction for "rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity." *See also* Treas. Reg. § 1.162-11(a) (allowing a deduction for payments made to acquire a leasehold).

---

[33] Our conclusion on this issue does not preclude the possibility that any loans to Main Street Lofts and K Lofts became worthless in later years.

**[\*36]** At trial, Mr. Reed testified that the Reeds' payments to the landowner in 2013, totaling $50,000, were rental payments for the farmland they used in that year. Although Mr. Reed acknowledged that he held an option to purchase the property, when asked whether his payments represented a deposit or advance on the ultimate purchase price for the property, he testified that the payments were "for 12 months of renting the property and occupying." Tr. 564.

The Commissioner has provided no evidence contrary to Mr. Reed's testimony. On brief, the Commissioner suggests that the landowner had stated that the $50,000 paid by Mr. Reed exceeded the fair market value of a one-year lease on the property. Rep't's Op. Br. 171. But the Commissioner has not provided evidence of any such statement. The landowner did not testify at trial, and the Commissioner's assertion on brief that the landowner once made a statement about the fair market value of leasing the property is not evidence. *See* Rule 143(c); *Niedringhaus v. Commissioner*, 99 T.C. 202, 214 n.7 (1992).

On this issue, we credit Mr. Reed's unrebutted testimony. We conclude that the Reeds are entitled to deduct their $50,000 rent expense for their 2013 taxable year.

D. *Interest Expense Amounts Claimed for 2015*

On the Schedule C attached to their 2015 return, the Reeds claimed a $27,215 interest expense deduction. The Commissioner disallowed the deduction.

The Reeds do not address the claimed deduction in posttrial briefing. Although their briefs refer to interest and interest expenses generally, those references appear to relate to the Reeds' transfers to the project entities, discussed above in Opinion Part IV.B. Because the Reeds have not specifically addressed on brief their entitlement to a $27,215 interest expense deduction, they have abandoned the issue. *See, e.g.*, *Mendes*, 121 T.C. at 312–13; *Nicklaus*, 117 T.C. at 120 n.4; *see also, e.g.*, *Miller*, 797 F.2d at 738.

Even if the issue were not abandoned, the record does not support the conclusion that the Reeds are entitled to an interest expense deduction for 2015. At trial, Mr. Reed testified that the expense arose from two loans. The first loan, according to Mr. Reed, was made to him by his father. The second was made by Connie DeMerell to a real estate

**[*37]** project entity, Capitol Lofts, LLC. Mr. Reed testified that he "personally" paid the interest due on the purported loans. Tr. 584.

Even if these loans existed, the record does not reflect the amount of interest paid on each loan or when such interest was paid. With respect to the purported loan from Mr. Reed's father, the parties have stipulated a letter dated March 19, 2017, which states:

> On April 4, 2012, I loaned Scott L. Reed $12,500. The loan will accrue interest at the 10-year U.S. Treasury Rate. All principal and interest on this loan will be due upon the sale of the Hall Davidson Buildings in Little Rock or by April 3, 2018, which ever [sic] comes first.

Ex. 67-P, at 1. Neither party has established when principal and interest on the purported loan ultimately became due, nor when they were paid, if at all. And the terms of the purported loan from Ms. DeMerell to Capitol Lofts, LLC, are even less clear.[34]

Further, the Reeds have not identified any Code provision or other authority that would allow Mr. Reed to pay interest owed by Capitol Lofts, LLC, to Ms. DeMerell and deduct it as the Reeds' own interest expense.

To summarize, the Reeds have abandoned the issue as to whether they are entitled to deduct as interest the $27,215 shown on their Schedule C for 2015. And the record does not support the conclusion that the Reeds paid interest in 2015 or that any interest they paid was deductible. Thus, we must sustain the Commissioner's determination with respect to the Reeds' 2015 interest expense.

Having resolved the Reeds' claims for deductions, we turn next to their claimed credit for the 2012 taxable year.

V.    *2012 General Business Credit*

On their 2012 return, the Reeds claimed a section 38 general business credit of $99,800 for rehabilitating the K Lofts property. They claimed the credit on Form 3800 and specified the full amount as an

---

[34] In his Opening Brief, the Commissioner points to an option agreement permitting Mr. Reed to purchase an interest in Capitol Lofts, LLC, from Ms. DeMerell, suggesting that the Reeds' claimed interest expense included payments for the option. The relationship between the purported loan from Ms. DeMerell and the option agreement, however, is unclear.

[*38] investment credit. An attached Form 3468 reported that the full $99,800 represented a rehabilitation credit. The Commissioner disallowed the credit.

The Reeds have not addressed their entitlement to the credit in posttrial briefing. They have therefore abandoned this issue, and the Court will not consider it. *See, e.g.*, *Mendes*, 121 T.C. at 312–13; *Nicklaus*, 117 T.C. at 120 n.4; *see also, e.g.*, *Miller*, 797 F.2d at 738.[35]

Next, we address the Reeds' liability for additions to tax and penalties the Commissioner determined.

## VI. *Additions to Tax and Penalties*

### A. *Additions to Tax for Failure to File a Timely Return*

Section 6651(a)(1) imposes an addition to tax for failure to file a timely return unless the taxpayer proves that such failure is due to reasonable cause and not willful neglect. *See Wheeler v. Commissioner*, 127 T.C. 200, 207 (2006), *aff'd*, 521 F.3d 1289 (10th Cir. 2008).

Under section 7491(c), the Commissioner bears the burden of production with respect to the liability of any individual for an addition to tax. *See Higbee*, 116 T.C. at 446. Here, the parties have stipulated certified transcripts of the Reeds' accounts for the taxable years 2012 through 2015, which reflect the dates on which the Reeds' returns were due during the years at issue. The parties have also stipulated the dates on which the Reeds filed their returns. Those stipulations confirm that the Reeds filed their 2012, 2013, 2014, and 2015 returns late and satisfy the Commissioner's burden of production with respect to the additions to tax.

Once the Commissioner has met his burden of production, the taxpayer bears the burden of proving that the late filing was due to

---

[35] In any event, it appears doubtful that the Reeds would be entitled to the credit for the taxable year 2012. As in effect for that year, section 47 provided a credit equal to a percentage of the "qualified rehabilitation expenditures" with respect to certain buildings and structures. I.R.C. § 47(a). And section 47(b) provided that "[q]ualified rehabilitation expenditures with respect to any qualified rehabilitated building shall be taken into account for the taxable year in which such qualified rehabilitated building is placed in service." *See generally Consumers Power Co. v. Commissioner*, 89 T.C. 710, 723–26 (1987) (discussing when property is "placed in service"). The record here does not suggest that K Lofts' property was placed in service before or during 2012.

**[\*39]** reasonable cause and not willful neglect. *See* Rule 142(a); *Higbee*, 116 T.C. at 447. The Reeds have not addressed their liability for the section 6651(a)(1) additions to tax in their posttrial briefing, and therefore they have abandoned the issue. *See, e.g.*, *Mendes*, 121 T.C. at 312–13; *Nicklaus*, 117 T.C. at 120 n.4; *see also, e.g.*, *Miller*, 797 F.2d at 738. Moreover, the record does not appear to support a finding of reasonable cause. Therefore, we conclude that the Reeds are liable for the section 6651(a)(1) additions to tax.

B.     *Substantial Understatement Penalty*

Section 6662 imposes an accuracy-related penalty equal to 20% of the portion of any underpayment of tax required to be shown on a return that is attributable to any substantial understatement of income tax. *See* I.R.C. § 6662(a), (b)(2). An understatement of income tax is "substantial" if it exceeds the greater of "10 percent of the tax required to be shown on the return for the taxable year" or "$5,000." I.R.C. § 6662(d)(1)(A).

The Commissioner bears the burden of production with respect to the liability of an individual for any penalty. I.R.C. § 7491(c); *Higbee*, 116 T.C. at 446. The Commissioner may satisfy this burden by presenting sufficient evidence to show that it is appropriate to impose the penalty in the absence of available defenses. *See Graev v. Commissioner*, 149 T.C. 485, 493 (2017) (citing *Higbee*, 116 T.C. at 446), *supplementing and overruling in part* 147 T.C. 460 (2016). For the Commissioner to meet his burden with respect to the substantial understatement penalty, Rule 155 computations must confirm a substantial understatement. *Clay v. Commissioner*, 152 T.C. 223, 246 (2019), *aff'd*, 990 F.3d 1296 (11th Cir. 2021); *George v. Commissioner*, T.C. Memo. 2026-10, at \*82.

The Commissioner must also show compliance with the procedural requirements of section 6751(b)(1). *See* I.R.C. § 7491(c); *Laidlaw's Harley Davidson Sales, Inc. v. Commissioner*, 29 F.4th 1066, 1072–74 (9th Cir. 2022), *rev'g and remanding* 154 T.C. 68 (2020); *see also Kraske v. Commissioner*, 161 T.C. 104, 111 (2023).

Section 6751(b)(1) provides that no penalty shall be assessed unless "the initial determination" of the assessment was "personally approved (in writing) by the immediate supervisor of the individual making such determination." Here, the record contains a Civil Penalty Approval Form signed by the examining agent's supervisor on

**[\*40]** November 29, 2016.  That approval was received timely under the rule set out in *Laidlaw's Harley Davidson Sales, Inc. v. Commissioner*, 29 F.4th at 1072–74.  Accordingly, the Commissioner has satisfied his burden with respect to the supervisory approval requirement of section 6751(b)(1), *see Kraske*, 161 T.C. at 111, and the Reeds do not contend otherwise.

No penalty is imposed under section 6662 with respect to any portion of an underpayment "if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to [it]."  I.R.C. § 6664(c)(1).  The Reeds have the burden to establish that they are excused from the penalty for reasonable cause.  *See United States v. Boyle*, 469 U.S. 241, 245 (1985); *see also Cooper v. Commissioner*, 877 F.3d at 1095.  But the Reeds have not argued that there was a reasonable cause for any portion of their underpayment.  Nor does the record appear to reflect that reasonable cause existed.

We conclude, therefore, that, if the Rule 155 computations confirm a substantial understatement exists, the Reeds are liable for an accuracy-related penalty under section 6662.

\*      \*      \*

We have considered all other arguments made by the parties, and to the extent not discussed above, find those arguments to be irrelevant, moot, or without merit.

To reflect the foregoing,

*Decision will be entered under Rule 155.*

**[*41]**                 APPENDIX A: ALLOWED DEDUCTIONS

*Taxable Year 2012*

| Date | Description | Amount |
|------|-------------|--------|
| 3/16/2012 | LDH Drafting | $1,000 |
| 4/2/2012 | Standard Abstract | 10,000 |
| 4/5/2012 | T. Chuba | 5,000 |
| 4/13/2012 | BRC | 2,500 |
| 5/3/2012 | T. Chuba | 5,000 |
| 5/15/2012 | LDH Drafting | 2,000 |
| 6/20/2012 | LDH Drafting | 2,000 |
| 7/2/2012 | LDH Drafting | 2,000 |
| 7/17/2012 | Tax Resources | 40 |
| 9/11/2012 | BRC | 483 |
| 9/17/2012 | LDH Drafting | 2,000 |
| 12/3/2012 | BRC | 470 |
| 12/19/2012 | Notary | 100 |
| *Total* | | $32,593 |

*Taxable Year 2013*

| Date | Description | Amount |
|------|-------------|--------|
| 1/22/2013 | David Robinson | $7,500 |
| 2/5/2013 | David Robinson | 3,500 |
| 2/19/2013 | David Robinson | 2,000 |
| 2/27/2013 | David Robinson | 2,000 |
| 3/15/2013 | David Robinson | 2,000 |
| 4/1/2013 | David Robinson | 2,000 |
| 4/15/2013 | David Robinson | 2,000 |
| 4/15/2013 | Dzyuba Consulting | 5,000 |
| 5/2/2013 | David Robinson | 7,000 |
| 5/2/2013 | Wiggington & Associates | 1,975 |
| 5/9/2013 | Tiempo Architecture | 5,000 |

[*42]

| Date | Description | Amount |
|---|---|---|
| 5/15/2013 | David Robinson | 2,000 |
| 5/21/2013 | David Robinson | 1,143 |
| 6/5/2013 | David Robinson | 3,500 |
| 7/3/2013 | David Robinson | 2,353 |
| 7/3/2013 | Dzyuba Consulting | 703 |
| 7/12/2013 | Dzyuba Consulting | 4,478 |
| 7/15/2013 | David Robinson | 2,000 |
| 7/29/2013 | Dzyuba Consulting | 3,423 |
| 8/1/2013 | David Robinson | 2,000 |
| 8/15/2013 | Day Law Group | 2,500 |
| 8/16/2013 | David Robinson | 2,000 |
| 8/29/2013 | David Robinson | 2,000 |
| 9/3/2013 | David Robinson | 5,000 |
| 9/17/2013 | David Robinson | 2,000 |
| 9/23/2013 | Dzyuba Consulting | 3,061 |
| 10/7/2013 | David Robinson | 2,000 |
| 10/7/2013 | Dzyuba Consulting | 3,398 |
| 10/17/2013 | David Robinson | 2,000 |
| 12/20/2013 | Mitchell Williams | 133 |
| Total | | $85,667 |

*Taxable Year 2014*

| Date | Description | Amount |
|---|---|---|
| 1/6/2014 | Aggressive Credit | $59 |
| 1/10/2014 | EMS | 3,000 |
| 1/13/2014 | 3J Consulting | 3,840 |
| 1/13/2014 | 3J Consulting | 1,000 |
| 1/14/2014 | Landcaster Engineering | 450 |
| 1/24/2014 | Experian | 13 |
| 2/6/2014 | Aggressive Credit | 59 |
| 2/7/2014 | Experian | 33 |
| 2/7/2014 | Studio Eccos Design | 3,000 |

[*43]

| | | |
|---|---|---|
| 2/18/2014 | CRE | 1,750 |
| 2/24/2014 | Experian | 13 |
| 2/25/2014 | Landcaster Engineering | 450 |
| 3/6/2014 | Aggressive Credit | 59 |
| 3/12/2014 | 3J Consulting | 9,310 |
| 3/17/2014 | EMS | 6,000 |
| 3/24/2014 | Experian | 13 |
| 3/27/2014 | CRE | 105 |
| 4/6/2014 | Aggressive Credit | 59 |
| 4/8/2014 | Studio Eccos Design | 1,993 |
| 5/7/2014 | LDH Drafting | 10,000 |
| 5/27/2014 | Experian | 13 |
| 6/6/2014 | Aggressive Credit | 29 |
| 6/24/2014 | Experian | 13 |
| 6/25/2014 | MyFICO | 60 |
| 7/6/2014 | Aggressive Credit | 29 |
| 7/24/2014 | Experian | 13 |
| 7/29/2014 | Brownfield Revitalization | 30,000 |
| 7/30/2014 | Novogradac | 5,000 |
| 8/20/2014 | Perkins Coie[36] | 1,000 |
| 8/25/2014 | Experian | 13 |
| 8/28/2014 | OR Sec State | 100 |
| 9/8/2014 | Aggressive Credit | 29 |
| 9/24/2014 | Experian | 13 |
| 9/24/2014 | MoJo Architects | 2,200 |
| 9/24/2014 | Washington County | 20 |
| 9/26/2014 | Dzyuba Consulting | 5,229 |
| 10/2/2014 | Perkins Coie | 1,500 |
| 10/6/2014 | Aggressive Credit | 29 |
| 10/6/2014 | BofA Practice | 625 |

---

[36] The parties' spreadsheets reflect payments made to "Perkins Cole." Testimony at trial, however, indicated that these payments were made to the law firm Perkins Coie.

**[*44]**

| Date | Description | Amount |
|---|---|---|
| 10/7/2014 | Studio Eccos Design | 3,081 |
| 10/15/2014 | 3J Consulting | 2,956 |
| 10/24/2014 | Experian | 13 |
| 11/6/2014 | Aggressive Credit | 29 |
| 11/24/2014 | Experian | 13 |
| 12/8/2014 | Aggressive Credit | 29 |
| 12/8/2014 | Terracon | 2,000 |
| 12/10/2014 | Perkins Coie | 4,489 |
| *Total* | | $99,731 |

*Taxable Year 2015*

| Date | Description | Amount |
|---|---|---|
| 1/27/2015 | Mitchell Williams | $2,101 |
| 2/10/2015 | Dzyuba Consulting | 1,777 |
| 3/16/2015 | Josh Blevins | 1,250 |
| 3/23/2015 | Dzyuba Consulting | 5,000 |
| 3/26/2015 | Good Ground Holdings | 1,507 |
| 4/10/2015 | Josh Blevins | 500 |
| 4/15/2015 | Josh Blevins | 750 |
| 5/4/2015 | Josh Blevins | 1,000 |
| 5/13/2015 | Perkins Coie | 3,314 |
| 5/22/2015 | Good Ground Holdings | 2,400 |
| 5/22/2015 | Josh Blevins | 3,423 |
| 5/29/2015 | Dzyuba Consulting | 2,675 |
| 5/29/2015 | Perkins Coie | 2,709 |
| 7/3/2015 | Good Ground Holdings | 1,600 |
| 7/28/2015 | Perkins Coie | 3,000 |
| 7/29/2015 | 3J Consulting | 562 |
| 8/18/2015 | Mitchell Williams | 1,100 |
| 9/11/2015 | Josh Blevins | 753 |
| 9/16/2015 | Josh Blevins | 1,000 |
| 9/24/2015 | Perkins Coie | 3,710 |

**[*45]**

| | | |
|---|---|---|
| 10/28/2015 | Perkins Coie | 5,691 |
| 12/8/2015 | Perkins Coie | 5,188 |
| 12/8/2015 | Studio Eccos | 6,975 |
| 12/16/2015 | Oregon Law Group | 4,748 |
| 12/31/2015 | Susman, Duffy & Sega | 10,000 |
| 12/31/2015 | William Kraus | 4,000 |
| | *Total* | $76,733 |

**[*46]**    APPENDIX B: DISALLOWED DEDUCTIONS

*Taxable Year 2012*

| Date | Description | Amount |
|------|-------------|--------|
| 2/22/2012 | Check #2040 | $50 |
| 3/7/2012 | Transfer 0306 | 20,460 |
| 4/13/2012 | Transfer 0306 | 250 |
| 5/15/2012 | Transfer 0306 | 4,120 |
| 5/21/2012 | Transfer 0306 | 2,025 |
| 5/31/2012 | J. Reed | 500 |
| 6/6/2012 | Check #2021 | 4,000 |
| 6/15/2012 | Transfer 0306 | 2,100 |
| 7/12/2012 | Carpet cleaning | 314 |
| 9/6/2012 | Transfer 0292 | 9,411 |
| 11/5/2012 | Transfer #2603 | 2,500 |
| 11/19/2012 | Dalquist | 975 |
| 12/3/2012 | Transfer #2603 | 2,000 |
| 12/10/2012 | Transfer 0306 | 4,000 |
| *Total* | | $52,705 |

*Taxable Year 2013*

| Date | Description | Amount |
|------|-------------|--------|
| 1/10/2013 | Marilyn Porter | $3,200 |
| 11/18/2013 | Troy Carpenter | 1,600 |
| *Total* | | $4,800 |

[*47]           *Taxable Year 2014*

| Date | Description | Amount |
|------|-------------|--------|
| 1/24/2014 | Will & Sons Excavation | $900 |
| 1/28/2014 | Bob Coron Electric | 200 |
| 3/3/2014 | Brian Boger | 105 |
| 3/20/2014 | AOA | 55 |
| 3/24/2014 | Delasco Dermalogic Council | 295 |
| 3/24/2014 | Trust Company | 1,300 |
| 5/14/2014 | RDNW | 78,080 |
| 5/16/2014 | Corporate Division | 400 |
| 7/21/2014 | Washington Park | 6 |
| 8/1/2014 | CJ Brown Sales | 2,500 |
| 8/7/2014 | RDNW | 5,021 |
| 8/11/2014 | All Weather HVAC | 2,500 |
| 8/28/2014 | Chad Rummonds | 500 |
| 10/14/2014 | RDNW | 4,000 |
| 10/16/2014 | RDNW | 500 |
| 11/5/2014 | Reed Dermatology NW | 2,000 |
| 11/10/2014 | Advantage Services | 3,275 |
| 11/18/2014 | Advantage Services | 3,275 |
| 11/28/2014 | RDNW | 12,000 |
| 11/28/2014 | RDNW | 50,000 |
| 12/12/2014 | RDNW | 4,000 |
| *Total* | | $170,912 |

*Taxable Year 2015*

| Date | Description | Amount |
|------|-------------|--------|
| 6/8/2015 | Orchard Supply | $18 |
| 8/3/2015 | Orchard Supply | 4 |
| 12/14/2015 | Orchard Supply | 112 |
| *Total* | | $134 |

**[*48]** APPENDIX C: DISALLOWED DEDUCTIONS

*Taxable Year 2012*

| Date | Description | Amount |
|------|-------------|--------|
| 1/6/2012 | JRC | $5,188 |
| 1/10/2012 | JRC | 120 |
| 1/12/2012 | Top Notch Turf | 50 |
| 1/23/2012 | JRC | 200 |
| 1/31/2012 | JRC | 500 |
| 1/31/2012 | JRC | 350 |
| 1/31/2012 | Transfer 0306 | 2,600 |
| 2/10/2012 | JRC | 850 |
| 2/15/2012 | JRC | 12,000 |
| 2/24/2012 | JRC | 100 |
| 2/24/2012 | JRC | 50 |
| 2/29/2012 | JRC | 3,200 |
| 3/15/2012 | JRC | 750 |
| 3/30/2012 | JRC | 220 |
| 4/4/2012 | JRC | 110 |
| 4/5/2012 | JRC | 3,620 |
| 4/30/2012 | JRC | 1,300 |
| 5/4/2012 | JRC | 750 |
| 6/19/2012 | Porter Design | 2,700 |
| 6/25/2012 | Cleaning | 250 |
| 7/11/2012 | Landscaping | 90 |
| 7/31/2012 | JRC | 311 |
| 8/22/2012 | Landscaping | 120 |
| 10/16/2012 | Landscaping | 150 |
| 11/7/2012 | Landscaping | 120 |
| 12/5/2012 | Landscaping | 75 |
| 12/31/2012 | Porter Design | 3,200 |
| *Total* | | $38,974 |

**[*49]** *Taxable Year 2013*

| Date | Description | Amount |
|---|---|---|
| 1/8/2013 | Creative Construction | $20,000 |
| 1/9/2013 | Bruce Reed | 1,000 |
| 1/17/2013 | Creative Construction | 10,000 |
| 1/22/2013 | Creative Construction | 25,000 |
| 2/5/2013 | Creative Construction | 15,000 |
| 2/13/2013 | Creative Construction | 10,000 |
| 2/19/2013 | Creative Construction | 20,000 |
| 4/1/2013 | Creative Construction | 10,000 |
| 4/24/2013 | Creative Construction | 5,000 |
| 4/29/2013 | Creative Construction | 15,858 |
| 4/30/2013 | Bruce Reed | 5,000 |
| 5/6/2013 | Creative Construction | 12,939 |
| 5/10/2013 | Creative Construction | 9,038 |
| 5/22/2013 | Creative Construction | 25,292 |
| 5/22/2013 | Creative Construction | 8,741 |
| 5/28/2013 | Creative Construction | 12,500 |
| 5/29/2013 | Creative Construction | 10,197 |
| 6/10/2013 | Creative Construction | 9,356 |
| 6/17/2013 | Creative Construction | 4,454 |
| 6/21/2013 | Creative Construction | 8,284 |
| 6/26/2013 | Creative Construction | 8,500 |
| 6/28/2013 | Creative Construction | 6,354 |
| 10/24/2013 | Creative Construction | 4,000 |
| *Total* | | $256,513 |

**[*50]**            *Taxable Year 2014*

| Date | Description | Amount |
|------|-------------|--------|
| 3/26/2014 | Matt Foster | $6,303 |
| 6/16/2014 | Angel Bueno | 120 |
| 6/18/2014 | MWF Construction | 6,400 |
| 6/30/2014 | Angel Bueno | 100 |
| 7/9/2014 | MWF Construction | 3,989 |
| 8/11/2014 | Angel Bueno | 100 |
| 8/18/2014 | Angel Bueno | 120 |
| 8/21/2014 | MWF Construction | 6,921 |
| 10/14/2014 | Angel Bueno | 70 |
| 10/29/2014 | MWF Construction | 5,400 |
| 11/20/2014 | MWF Construction | 3,900 |
| 11/28/2014 | Angel Bueno | 60 |
| 12/09/2014 | MWF Construction | 1,050 |
| *Total* | | $34,533 |

*Taxable Year 2015*

| Date | Description | Amount |
|------|-------------|--------|
| 1/8/2015 | MWF Construction | $2,685 |
| 1/30/2015 | MWF Construction Cashier Check | 12,000 |
| *Total* | | $14,685 |